# Exhibit B

CLERK, U.S. DISTRICT COURT

DEC 9 2004

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAREK MOLSKI, an individual; and DISABILITY RIGHTS ENFORCEMENT EDUCATION SERVICES: HELPING YOU HELP OTHERS, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>MANDARIN TOUCH RESTAURANT; EVERGREEN DYNASTY CORP., a California corporation; and BRIAN McINERNEY and KATHY S. McINERNEY, as joint tenants,<br><br>Defendants. | Case No. CV 04-0450 ER<br><br>ORDER GRANTING DEFENDANT'S MOTION TO DECLARE JAREK MOLSKI A VEXATIOUS LITIGANT AND FOR A PRE-FILING ORDER REQUIRING MOLSKI TO OBTAIN LEAVE OF COURT BEFORE FILING ANY OTHER CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT |

Defendant Evergreen Dynasty Corporation, doing business as Mandarin Touch Restaurant,[1] has asked this Court to declare Plaintiff Jarek Molski a vexatious litigant, and to order Molski to obtain leave of court

---

[1] Brian and Kathy S. McInerney did not join in the Motion for a Pre-Filing Order. For simplicity, this order will refer to Mandarin Touch and Evergreen Dynasty, collectively, as "Defendant."

1 before filing any other claims under the Americans With
2 Disabilities Act. The matter came on for hearing on
3 November 15, 2004, the Honorable Edward Rafeedie
4 presiding. The Court has concluded that a pre-filing
5 order is appropriate for the reasons discussed below.
6 **Statement of Facts**
7 a. **Plaintiff's History of Litigation**
8 Plaintiff Jarek Molski is a physically disabled
9 individual who relies on a wheelchair for ambulation.
10 Although he resides in Woodland Hills, he has filed
11 hundreds[2] of lawsuits in federal courts throughout the
12 state of California.
13 A review of the cases submitted to this Court
14 reveals that many are nearly identical in terms of the
15 facts alleged, the claims presented, and the damages
16 requested. In virtually every complaint involving a
17 restaurant or winery, Molski initially reports having
18 trouble finding adequate van-accessible parking. Then,
19 almost uniformly, he reports difficulties entering the
20 business, often citing ramps that are too steep, or
21 doors that require more pressure to open than is
22

23 [2] Defendant's Memorandum of Points and Authorities
asserts that Molski has filed 334 lawsuits in the federal courts
24 since 1998. During the hearing, Plaintiff's counsel stated that
Molski had filed approximately 400 suits, and the Court will
25 accept that number. Despite this considerable number of filings,
Molski has never litigated a suit on the merits in the Central
26 District of California. The vast majority of his claims settle,
with a significant minority dismissed for lack of prosecution or
27 violation of a court order.
28

-2-

1  permitted by law. After entering the business, Molski
2  generally complains that the service counter is too
3  high. Virtually every complaint ends with Molski
4  venturing to the restroom, which inevitably suffers
5  from at least one violation. Molski almost always
6  suffers some injury - typically to the upper
7  extremities - in the process of transferring himself
8  from his wheelchair to the toilet. He also regularly
9  complains of suffering humiliation or other emotional
10  distress from the experience. Molski's prayer for
11  relief routinely includes both a request for injunctive
12  relief and damages of $4,000 per day, for each day
13  after his visit until the facility is brought up to ADA
14  standards.

15       The facts of the instant case are predictably
16  similar. On January 25, 2003, Molski's complaint
17  alleges that he had dinner at the Mandarin Touch
18  Restaurant in Solvang, California. After dinner,
19  Molski attempted to use the restroom, but found that
20  the entrance was too narrow. Molski then alleges that,
21  as he was attempting to leave the restroom, his hand
22  became "caught in the exterior door causing trauma to
23  it." The lawsuit asks for injunctive relief to bring
24  the restaurant up to ADA standards, and damages of not
25  less than $4,000 per day, for each day after his visit
26  until such time as the restaurant is made fully
27  accessible.
28

-3-

b. The Americans With Disabilities Act

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., was signed into law in 1990. Its stated goal is to remedy discrimination against individuals with disabilities.[1] To that end, Title III of the ADA, 42 U.S.C. § 12181, et seq., requires the removal of structural barriers in existing public accommodations "where such removal is readily achievable."[2] 42 U.S.C. § 12182(b)(2)(A)(iv). See also 28 C.F.R. § 36.304 (2004)(listing examples of, and prioritizing, readily achievable repairs). Where removal of the barrier is not readily achievable, the facility must provide access "through alternative

[1]      The ADA states:
It is the purpose of this Act—
  (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;
  (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;
  (3) to ensure that the Federal Government plays a central role in enforcing the standards established in this Act on behalf of individuals with disabilities; and
  (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.
42 U.S.C. § 12101(b).

[2]      The ADA defines "readily achievable" as "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181 (9).

-4-

1 methods if such methods are readily achievable." 42

2 U.S.C. § 12182(b)(2)(A)(v).

3      To enforce Title III, the ADA contains both a

4 private right of action, 42 U.S.C. § 12188(a), and a

5 right of action for the Attorney General, 42 U.S.C. §

6 12188(b). While the Attorney General may seek monetary

7 damages on behalf of an aggrieved party, 42 U.S.C. §

8 12188(b)(2)(B), the only remedies available under the

9 private right of action are injunctive relief and the

10 recovery of attorneys' fees and costs. 42 U.S.C. §

11 12188(a)(1); 42 U.S.C. § 2000a-3(a). By providing

12 different remedies for public and private enforcement,

13 Congress clearly demonstrated its intent to prevent

14 private plaintiffs from recovering money damages under

15 the ADA. American Bus Ass'n v. Slater, 231 F.3d 1, 5

16 (D.C. Cir. 2000) ("By specifying the circumstances

17 under which monetary relief will be available, Congress

18 evinced its intent that damages would be available in

19 no others.").

20      However, enterprising plaintiffs (and their

21 attorneys) have found a way to circumvent the will of

22 Congress by seeking money damages while retaining

23 federal jurisdiction. Because a violation of the ADA

24 also constitutes a violation of California's Unruh

25 Civil Rights Act, Cal. Civ. Code § 51(f), and the

26 California Disabled Persons Act ("CDPA"), Cal. Civ.

27 Code § 54(c), Plaintiffs can sue in federal court for

28 injunctive relief under the ADA, and tack on state law

-3-

1  claims for money damages under the Unruh Act and CDPA.
2  See, e.g., Moeller v. Taco Bell Corp., 220 F.R.D. 604,
3  607 (N.D. Cal. 2004).

4       The ability to profit from ADA litigation has given
5  birth to what one Court described as "a cottage
6  industry." Rodriguez v. Investco, L.L.C., 305 F. Supp.
7  2d 1278, 1280-81 (M.D. Fla. 2004). The scheme is
8  simple: an unscrupulous law firm sends a disabled
9  individual to as many businesses as possible, in order
10 to have him aggressively seek out any and all
11 violations of the ADA. Then, rather than simply
12 informing a business of the violations, and attempting
13 to remedy the matter through "conciliation and
14 voluntary compliance," id. at 1281, a lawsuit is filed,
15 requesting damage awards that would put many of the
16 targeted establishments out of business. Faced with
17 the specter of costly litigation and a potentially
18 fatal judgment against them, most businesses quickly
19 settle the matter.

20      The result of this scheme is that "the means for
21 enforcing the ADA (attorney's fees) have become more
22 important and desirable than the end (accessibility for
23 disabled individuals)." Brother v. Tiger Partner, LLC,
24 331 F. Supp. 2d 1368, 1375 (M.D. Fla. 2004). Serial
25 plaintiffs, like Molski, serve as "professional pawn[s]
26 in an ongoing scheme to bilk attorney's fees."
27 Rodriguez, 305 F. Supp. 2d at 1285. It is a "type of
28 shotgun litigation [that] undermines both the spirit

- 6 -

1 | and purpose of the ADA." Brother, 331 F. Supp. 2d at
2 | 1375.[5]

3 | Analysis

4 |   a. Authority to Issue Pre-Filing Order

5 |   The District Court has the inherent power to levy

6 | sanctions in response to abusive litigation practices.

7 | See, e.g., Roadway Express, Inc. v. Piper, 447 U.S.

8 | 752, 765-66 (1980). This inherent power is augmented

9 | by Local Rule 83-8, which empowers this Court to craft

10 | an appropriate sanction to defend against vexatious

11 | litigation, including, but not limited to, "a directive

12 | to the Clerk not to accept further filings from the

13 | litigant without payment of normal filing fees and/or

14 | without written authorization from a judge of the Court

15 | or a Magistrate Judge, issued upon such showing of the

16 | evidence supporting the claim as the judge may

17 | require." C.D. Cal. Local Rule 83-8.2.

18 |

19 |   [5] The Brother court expressed serious concerns about the
20 | "vexatious litigation tactics" employed by serial ADA plaintiffs,
and called upon the Congress to formulate a legislative solution
21 | to the problem. 331 F. Supp. 2d at 1375. Pending legislative
reform, however, "[t]he appropriate mechanism for addressing
22 | allegations of such behavior lies with the ethics and
disciplinary bodies of State bar associations or with the court
23 | where the litigation is pending." ADA Notification Act: Hearings
on H.R. 3590, before the Subcomm. on the Constitution of the
24 | House Comm. on the Judiciary (May 18, 2000), available at:
25 | http://commdocs.house.gov/committees/judiciary/hju66728.000/hju66
728_0.htm.

26 |   [6] Local Rule 83-8 also states:
27 |         It is the policy of the Court to discourage
vexatious litigation and to provide persons who are
28 |         subjected to vexatious litigation with security

-7-

b. Standard for Vexatious Litigant

In deciding whether or not to restrict a litigant's access to the courts, "[u]ltimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." Safir v. United States Lines, Inc., 792 F.2d 19, 23 (2nd Cir. 1986). In doing so, the Court should look to five factors: (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties. See id.

1. Litigant's History of Litigation

A "vexatious suit" is a "lawsuit instituted

---

against the costs of defending against such litigation and appropriate orders to control such litigation. It is the intent of this rule to augment the inherent power of the Court to control vexatious litigation and nothing in this rule shall be construed to limit the Court's inherent power in that regard.
C.D. Cal. Local Rule 83-8.1.

-8-

1  maliciously and without good cause." Black's Law
2  Dictionary 1596 (8th ed. 2004). After examining
3  Plaintiff's extensive collection of lawsuits, the Court
4  believes that most, if not all, were filed as part of a
5  scheme of systematic extortion, designed to harass and
6  intimidate business owners into agreeing to cash
7  settlements.

8       The Court bases this determination on several
9  considerations. One is the sheer volume of lawsuits
10 filed by this Plaintiff. Although litigiousness alone
11 is insufficient to justify a restriction on filing
12 activities, see In re Oliver, 682 F.2d 443, 446 (3rd
13 Cir. 1982), it is a factor the Court considers
14 indicative of an intent to harass. See De Long v.
15 Hennessey, 912 F.2d 1144, 1147 (9th Cir. 1990) (stating
16 that in order to issue a prefiling order, "[a]t the
17 least, the record needs to show, in some manner, that
18 the litigant's activities were numerous or abusive").
19 Here, Molski's filing are plainly numerous, and, as
20 discussed throughout this order, abusive as well. ·

21      Another consideration is the textual and factual
22 similarity of the complaints filed by Plaintiff. This
23 too, while not dispositive, is a factor the Court
24 considers indicative of an intent to harass, as it
25 suggests that Plaintiff is filing boilerplate
26 complaints. See In re Powell, 851 F.2d 427, 431 (D.C.
27 Cir. 1988) (stating that "the district court should
28 attempt to discern whether the filing of several

-9-

similar types of actions constitutes an intent to
harass the defendant or the court").

Most important, however, is the Court's conclusion
that the allegations contained in Plaintiff's
complaints are contrived and not credible. Although it
is not obvious when looking at an individual complaint,
examining Plaintiff's complaints in the aggregate
reveals a clear intent to harass businesses.

For example, in Molski v. El J Mares Restaurant,
Case No. C04-1882 (N.D. Cal. 2004), Molski claims that,
on May 20, 2003, he and significant other, Brygida
Molski, attended the El 7 Mares Restaurant for the
purposes of dining out.  Molski alleges that the
restaurant lacked adequate handicapped parking, and
that the food counter was too high.  After the meal,
Molski attempted to use the restroom, but because the
toilet's grab bars were improperly installed, he
injured his shoulders in the process of transferring
himself from his wheelchair to the toilet.  Thereafter,
he was unable to wash his hands because of the
lavatory's design.

Although this complaint appears credible standing
alone, its validity is undermined when viewed alongside
Molski's other complaints.  In Molski v. Casa De Fruta,
L.P., Case No. C04-1981 (N.D. Cal. 2004), Molski
alleges that he sustained nearly identical injuries on
the exact same day, May 20, 2003.  In Casa de Fruta,
Molski alleges that he and significant other, Brygida

1  Molski, patronized Casa de Fruta for the purpose of
2  wine tasting.  On arrival, Molski was again unable to
3  locate van accessible parking.  Once inside, Molski
4  again found the counter to be too high.  After wine
5  tasting, Molski again decided to use the restroom, and
6  again, injured his upper extremities while in the
7  process of transferring himself to the toilet.
8  Thereafter, he was once again unable to wash his hands
9  due to the design of the lavatory.

10      This was, apparently, not the end of Molski's day.
11  In Molski v. Rapazzini Winery, Case No. C04-1881 (N.D.
12  Cal. 2004), Molski once again alleges that he sustained
13  nearly identical injuries on the exact same day, May
14  20, 2003.  Molski, again accompanied by Brygida Molski,
15  claims he visited the Rapazzini Winery for the purpose
16  of wine tasting.  Again, Molski complains that the
17  parking lot lacked adequate handicapped van accessible
18  parking.  Upon entering the establishment, he
19  discovered that the counter was too high.  After
20  tasting wine, he again needed to use the restroom.  In
21  the course of transferring himself from his wheelchair
22  to the toilet, he injured himself yet again.
23  Thereafter, he was again unable to wash his hands due
24  to the lavatory's design.

25      The Court is tempted to exclaim: "what a lousy
26  day!"  It would be highly unusual - to say the least -
27  for anyone to sustain two injuries, let alone three, in
28  a single day, each of which necessitated a separate

1 federal lawsuit. But in Molski's case, May 20, 2003,
2 was simply business as usual. Molski filed 13 separate
3 complaints for essentially identical injuries sustained
4 between May 19, 2003 and May 23, 2003. The Court
5 simply does not believe that Molski suffered 13 nearly
6 identical injuries, generally to the same part of his
7 body, in the course of performing the same activity,
8 over a five-day period. This is to say nothing of the
9 hundreds of other lawsuits Molski has filed over the
10 last four years, many of which make nearly identical
11 allegations. The record before this Court leads it to
12 conclude that these suits were filed maliciously, in
13 order to extort a cash settlement.

14      It is possible, even likely, that many of the
15 businesses sued were not in full compliance with the
16 ADA. However, "[f]or purposes of imposing sanctions
17 under the inherent power of the court, a finding of bad
18 faith 'does not require that the legal and factual
19 basis for the action prove totally frivolous; where a
20 litigant is substantially motivated by vindictiveness,
21 obduracy, or mala fides, the assertion of a colorable
22 claim will not bar the assessment of (sanctions].'"
23 Fink v. Gomez, 239 F.3d 989, 992 (9th Cir.
24 2001) (citations omitted). See also Vollmer v. Selden,
25 350 F.3d 656, 660 (7th Cir. 2003) (a non-frivolous
26 filing may be sanctionable if filed for an improper
27 purpose, such as extortion). So, even if the
28 businesses sued by Molski were in violation of the ADA,

-12-

1 | this fact is outweighed by the Court's finding that he
2 | acted in bad faith, for the improper purpose of
3 | extorting a settlement. The Court therefore finds that
4 | Molski has a considerable history of vexatious
5 | litigation. See Brother, 331 F. Supp. 2d at 1375
6 | (describing a similar pattern of "shotgun" ADA
7 | litigation, designed to extort attorneys' fees, as
8 | "vexatious litigation").

9 | 2. Litigant's Motive

10 | The next factor to be considered is the litigant's
11 | motive in bringing the lawsuit. Molski claims that his
12 | motivation was to obtain injunctive relief, and that
13 | the funds recovered were largely used to offset his
14 | legal expenses. But this explanation is undercut by
15 | his course of action. The ADA itself allows private
16 | plaintiffs to sue for injunctive relief, and to recover
17 | their attorneys' fees and costs. It does not allow for
18 | any award of money damages to a private plaintiff. If
19 | Molski's motivation was genuinely to obtain injunctive
20 | relief and recover his legal costs, he could sue
21 | entirely under the ADA. But he does not do that.
22 | Instead, Molski almost always raises additional state
23 | law claims under the CDPA, California Health & Safety
24 | Code, the Unruh Civil Rights Act, and California Bus. &
25 | Prof. Code § 17200, which allow for the recovery of
26 | money damages.

27 | Clearly, raising multiple claims, by itself, is not
28 | unethical or vexatious. However, it is consistent with

-13-

1 an overall pattern of behavior that demonstrates
2 Molski's motivation is, ultimately, to extract a cash
3 settlement. The threat of significant money damages[7] is
4 a much more effective inducement to settle than merely
5 requesting a court order to make "readily achievable"
6 repairs. And that threat appears to be working.
7 Almost as startling as the sheer number of complaints
8 Molski has filed, is the number of those claims that
9 settle. Of the hundreds of cases Molski has filed in
10 this district, not one has ever been litigated on the
11 merits. The overwhelming majority settle, with a
12 significant minority dismissed for violation of a court
13 order, or failure to prosecute the claim. This not
14 only calls into question Molski's good faith
15 expectation of prevailing on the merits of his claim,
16 but also suggests that he does not even have a
17 reasonable expectation (or intention) of litigating the
18 suit on the merits.[8] Molski's m.o. is clear: sue,
19 settle, and move on to the next suit.

20

21

22   [7] And the damages requested are quite significant. Molski
23 routinely asks for $4,000 per day, for every day from his visit
until the repairs are completed. And Molski often waits a year
24 or more before filing suit. In the instant case, the purported
violation took place on January 25, 2003, but the suit was not
25 filed until January 23, 2004. That delay alone would be worth
$1,452,000 if Molski received the damages requested.

26
   [8] Additionally, given Molski's considerable history of
27 making questionable claims, a jury could reasonably refuse to
credit his testimony. This further weakens the likelihood of
28 Molski prevailing on the merits of his claims.

-14-

### 3. Representation By Counsel

The next factor is whether or not Molski is
represented by counsel. Molski has been represented by
counsel in every lawsuit that this Court is aware of.
Although courts are generally protective of pro se
litigants, this same protection does not apply to
litigants represented by counsel, and thus, this factor
also weighs against Plaintiff. See Iwachiw v. N.Y. City
Bd. of Elections, 273 F. Supp. 2d 224, 228 (E.D. N.Y.
2003).

### 4. Burden On the Courts

The fourth factor is whether Plaintiff has caused
needless expense to other parties or unnecessarily
burdened the courts. Because Plaintiff has filed a
countless number of vexatious claims, the Court
believes this factor plainly weighs against him.

### 5. Adequacy of Other Sanctions

The final factor is whether sanctions, other than a
pre-filing order, could adequately protect the court
and other parties. For the reasons already discussed,
the Court believes the answer is no. As noted above,
Plaintiff's filings appear meritorious when examined
individually. Their vexatious nature is revealed only
when viewed in the aggregate. Thus, the only effective
way to put a reviewing judge on notice of Plaintiff's
history is to require Molski to file a copy of this
order with every new complaint that he seeks to file.
This would allow the reviewing judge to assess whether

-15-

1  Molski had raised a bona fide claim of discrimination
2  under the ADA, or whether he was merely bringing
3  another vexatious claim in order to strong arm a
4  business into settling. See, e.g., In re Billy Roy
5  Tyler, 839 F.2d 1290, 1293-94 (8th Cir. 1988) (per
6  curiam) (holding that a pre-filing order is appropriate
7  where petitioner was able to consistently dress up
8  frivolous claims so that, on the face of the complaint,
9  they appeared to be meritorious).

10  Conclusions

11      The Court is convinced that a pre-filing order is
12  justified and necessary to prevent Molski from filing
13  any further vexatious complaints. The Court has no
14  doubt that Molski's "shotgun litigation" tactics
15  "undermine[] both the spirit and purpose of the ADA."
16  In addition to misusing a noble law, Molski has plainly
17  lied in his filings to this Court. His claims of being
18  the innocent victim of hundreds of physical and
19  emotional injuries over the last four years defy belief
20  and common sense.

21      But Molski has not acted alone. In every action,
22  Molski is aided and abetted by his attorneys, often the
23  Thomas E. Frankovich Law Offices, and his corporate co-
24  Plaintiff, Disability Rights Enforcement Education
25  Services: Helping You Help Others ("DREES").[9]  For that
26  _____

27      [9]  The Court notes that it has at least one other case
    currently before it involving DREES and the Frankovich firm.  The
28  named plaintiff in that case is Les Jankey.  Jankey v. Yang Chow

- 16 -

1 reason, this Court is also issuing orders to show cause
2 why the Court should not exercise its inherent power to
3 extend similar sanctions to them, for their role in
4 facilitating Molski's abusive litigation practices.[12]

5     The Court is also troubled by the fact that Molski
6 raises a *federal* ADA claim in the federal courts, while
7 seeking a remedy, money damages, exclusively available
8 under state law.[11] Even if proven, the ADA claim would
9 not entitle Molski to any relief that is not already
10 available under state law. Additionally, the burden of
11 proving an ADA claim is necessarily at least as high as
12 proving a violation to the California statutes, as a
13 violation of the ADA constitutes a prima facie
14 violation of those statutes. Thus, the ADA claims do
15 not extend Molski any benefit in terms of the
16 litigation itself, or the remedies he may seek, other
17 than allowing him to proceed in the federal courts.

18     For that reason, the Court believes that Molski's
19 ADA claims are a sham, used as a pretext to gain access
20 to the federal courts, while he pursues remedies that

21

22 *Restaurant*, CV 03-2235 (C.D. Cal. 2003). While less prolific
than Molski, the Court's computer docketing program reveals that
23 Jankey has filed 36 claims in the Central District, including 21
cases filed in 2004 alone. In each of these cases, Jankey was
24 represented by the Frankovich firm, and DREES is a co-plaintiff.

25 [10]   The Court will also issue an order to show cause why
26 DREES's claims should not be dismissed for a lack of standing.

27 [11]   Although Molski does seek injunctive relief and
attorneys' fees under the ADA, he also requests them as part of
28 his state law claims.

-17-

1   are available - sometimes exclusively - under
2   California state law.  Therefore, the Court will also
3   issue an order to show cause why Molski's ADA complaint
4   should not be dismissed, and his remaining claims
5   remanded back to state court, for lack of subject
6   matter jurisdiction.
7        Sadly, Molski is not unique.  The Trevor Law Group,
8   and others like it, have achieved infamy in California
9   for carrying out a similar scheme under California's
10  Unfair Business Practices statute, Bus. & Prof. Code §
11  17200 et seq.  As one Court described it:

12       The abuse is a kind of legal shakedown
         scheme: Attorneys form a front "watchdog"
13       or "consumer" organization. They scour
         public records on the Internet for what are
14       often ridiculously minor violations of some
         regulation or law by a small business, and
15       sue that business in the name of the front
         organization. Since even frivolous lawsuits
16       can have economic nuisance value, the
         attorneys then contact the business (often
17       owned by immigrants for whom English is a
         second language), and point out that a
18       quick settlement (usually around a few
         thousand dollars) would be in the
19       business's long-term interest.
         People ex rel. Lockyer v. Brar, 115 Cal.
20       App. 4th 1315, 1316-17 (2004).

21       These words could apply, almost verbatim, to the
22  scheme perpetrated by Molski, DREES, and the Frankovich
23  firm.  And this Court is not unmindful of the result of
24  the Trevor Law Group's abuse of the Unfair Business
25  Practices statute.  In the most recent election, the
26  citizens of California overwhelmingly backed
27  Proposition 64, which greatly limited the private
28  attorney general provision of that law.  It is not

-18-

1  beyond the realm of belief that the actions of Molski,
2  and those like him, pose a similar threat to the ADA.

3      Thus, this pre-filing order serves as a bulwark
4  that not only shields the Court and defendants from
5  vexatious litigation, but also protects the "purpose
6  and spirit of the ADA." It does not limit the right of
7  a legitimately aggrieved disabled individual to seek
8  legal relief under the ADA; it only prevents abuse of
9  that law by professional plaintiffs, like Molski, and
10 their lawyers, such as the Frankovich firm, whose
11 priority is their own financial gain, and not "the
12 elimination of discrimination against individuals with
13 disabilities." 42 U.S.C. § 12101(b)(1).

14     For all of these reasons, the Court finds that
15 Jarek Molski is a vexatious litigant. Before filing
16 any new litigation alleging violations of Title III of
17 the ADA in the United States District Court for the
18 Central District of California, Molski is hereby
19 ordered to file a motion for leave to file a complaint.
20 Molski must submit a copy of this order and a copy of
21 the proposed filing with every motion for leave. This
22 will allow a reviewing judge to assess whether the
23 proposed filing is made in good faith, or is simply
24 another attempt to extort a settlement.

25 **Rule 11 Sanctions**

26     Defendant has also requested sanctions under Rule
27 11. At this point, the Court has not made any formal
28 determination regarding the merits of the instant case,

1  and as such, Rule 11 sanctions would be premature. The
2  request for sanctions is therefore DENIED.

3

4

5  IT IS SO ORDERED.

6  IT IS FURTHER ORDERED that the Clerk of the Court shall
7  serve, by United States mail or by telefax or by email,
8  copies of this Order on counsel for the parties in this
9  matter.

10       Dated:    DEC - 9 2004

11

12

13       EDWARD RAFEEDIE
         Senior United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-20-